Approved: __/s/ NWC__   ORIGINAL
NICHOLAS W. CHIUCHIOLO
Assistant United States Attorney

Before:  HONORABLE GABRIEL W. GORENSTEIN
         Chief United States Magistrate Judge
         Southern District of New York

**19MAG 7922**

------------------------------------x
                                    :
UNITED STATES OF AMERICA            :   COMPLAINT
                                    :
        - v. -                      :   Violation of 21 U.S.C.
                                    :   § 846
LUIS PARRALES, and                  :
GILBERTO LUCIANO VAZQUEZ,           :
                                    :   COUNTY OF OFFENSE:
            Defendants.             :   NEW YORK
                                    :
------------------------------------x

STATE OF NEW YORK            ) ss:
SOUTHERN DISTRICT OF NEW YORK )

CHRISTOPHER GULINO, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

COUNT ONE
(Narcotics Conspiracy)

1. In or about August 2019, in the Southern District of New York and elsewhere, LUIS PARRALES and GILBERTO LUCIANO VAZQUEZ, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

2. It was a part and object of the conspiracy that LUIS PARRALES and GILBERTO LUCIANO VAZQUEZ, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that LUIS PARRALES and GILBERTO LUCIANO VAZQUEZ, the defendants, conspired to

1

distribute and possess with intent to distribute was 500 grams and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(B).

        (Title 21, United States Code, Section 846.)

        The bases for my knowledge of the foregoing charge are, in part, as follows:

    4. I am a Special Agent with HSI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### The August 13, 2019 Arrest

    5. Based on my participation in this investigation, including my review of reports and my conversations with other law enforcement agents, I am aware of the following, in substance and among other things:

        a. On or about August 13, 2019, GILBERTO LUCIANO VAZQUEZ, the defendant, and Carlos Parrales were arrested in Newark, New Jersey in connection with an ongoing narcotics investigation (the "August 13 Arrest"). The following day, on or about August 14, 2019, VAZQUEZ and Carlos Parrales were charged by complaint (the "August 14 Complaint") in this District with participating in a conspiracy to distribute and possess with intent to distribute five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(A) and 846. A copy of the August 14 Complaint is annexed hereto as Exhibit A and is incorporated herein as if set forth in full. Both VAZQUEZ and Carlos Parrales were presented on August 14, 2019 before the Honorable Henry B. Pitman, United States Magistrate Judge for the Southern District of New York,

and were ordered released that same day subject to certain conditions.

      b.    As alleged in the August 14 Complaint, on or about August 13, 2019, law enforcement agents were conducting physical surveillance in the vicinity of Doremus Avenue and Delancy Street in Newark, New Jersey, of a dirt lot with numerous eighteen-wheeler tractor trailers parked on it (the "Lot"). Agents were conducting surveillance at the Lot because they had knowledge, based on conversations with other individuals with knowledge relevant to the investigation, that a narcotics transaction was likely to take place in the vicinity of the Lot.

      c.    On or about August 13, 2019, at approximately 10:20 p.m., law enforcement agents observed a black Mercedes sedan ("Vehicle-1"), in the vicinity of the Lot, conducting what appeared to them, based on their training and experience, to be counter surveillance. Specifically, agents observed Vehicle-1 driving at a slow rate of speed on the streets surrounding the Lot, which is an industrial area that, at that time, had little other vehicle traffic. While Vechile-1 was conducting counter surveillance, agents observed Vehicle-1 flash its headlights at one of the unmarked law enforcement vehicles.

      d.    After observing Vehicle-1 conduct counter surveillance for approximately twenty minutes, agents observed a black Toyota Camry ("Vehicle-2") exit the Lot. Both Vehicle-1 and Vehicle-2 departed the area at a high rate of speed.

      e.    Thereafter, agents conducted separate traffic stops of Vehicle-1 and Vehicle-2. The driver of Vehicle-1 was identified as Carlos Parrales and was placed under arrest, and, as set forth above, was subsequently charged in the August 14 Complaint. Based on my participation in this investigation, including my review of information contained in publicly-available databases, I am aware that Carlos Parrales is the brother of LUIS PARRALES, the defendant.

      f.    Law enforcement agents searched Vehicle-2 pursuant to the automobile exception to the Fourth Amendment's warrant requirement. Inside of Vehicle-2's trunk, agents found multiple coolers, which, collectively, contained approximately forty-two packages of a white powdery substance that appeared to the agents, based on their training and experience, to be cocaine. Agents subsequently field tested one of these kilogram packages, which tested positive for the presence of cocaine.

Based on my conversations with other law enforcement agents, I am aware that the narcotics seized from Vehicle-2 weighed approximately 46.3 kilograms.

      g.    Thereafter, law enforcement agents arrested the driver of Vehicle-2, who was later identified as VAZQUEZ. A Spanish-speaking agent advised VAZQUEZ of his *Miranda* rights, in Spanish, and VAZQUEZ agreed to waive those rights.

      h.    VAZQUEZ told agents, in substance and in part, that two other individuals ("CC-1" and "CC-2") picked up VAZQUEZ in Brooklyn, New York, earlier that evening, and CC-1, CC-2, and VAZQUEZ traveled together to the Lot. VAZQUEZ further told agents, in substance and in part, that, while at the Lot, VAZQUEZ observed CC-1 and CC-2 obtain the narcotics from a barrel (the "Barrel") and load them into coolers inside Vehicle-2's trunk. VAZQUEZ stated, in substance and in part, that the narcotics did not belong to him but CC-1 and CC-2 were supposed to pay VAZQUEZ approximately $200 to transport Vehicle-2, which contained the narcotics, to New York.

      i.    VAZQUEZ further stated, in substance and in part, that he believed there were additional narcotics and a large quantity of cash located at the Lot. VAZQUEZ directed the agents to the Barrel from which CC-1 and CC-2 retrieved the narcotics and a specific tractor-trailer parked on the Lot (the "Tractor-Trailer"). Inside the Barrel, agents observed numerous packages containing a white, powdery substance, which packages looked similar in appearance to the packages seized from inside Vehicle-2. Based on my conversations with other law enforcement agents who weighed these packages and field tested one of them, I am aware that the packages obtained from the Barrel weighed approximately 25.78 kilograms and field tested positive for the presence of cocaine.

      j.    VAZQUEZ further stated, in substance and in part, that he believed that the Tractor-Trailer contained additional narcotics and a large quantity of cash. VAZQUEZ described the Tractor-Trailer as having the words "Yalenny" and "TTS" in red lettering on the side of the truck. While standing on the street adjacent to the Lot, agents observed a tractor-trailer parked on the Lot that matched the description of the Tractor-Trailer provided by VAZQUEZ.

      k.    Agents returned to the Lot the next morning, on or about August 14, 2019, but the Tractor-Trailer was no longer parked on the Lot.

4

1.      Based on my review of records maintained in law enforcement databases, I am aware that "Yalenny" is a trucking company owned by LUIS PARRALES, the defendant, and the brother of Carolos Parrales who was charged in the August 14 Complaint. I am further aware that LUIS PARRALES is the registered owner of Vechicle-1, *i.e.*, the black Mercedes, driven by Carlos Parrales, that agents observed conducting counter surveillance in the vicinity of the Lot on or about the evening of August 13, 2019, in the course of the narcotics transaction described above.

### Investigation of CC-3

6.      Based on my conversations with other law enforcement agents and my review of reports, I am aware of the following, in substance and among other things:

      a.     Law enforcement agents have been conducting an investigation into a particular individual ("CC-3")CC-3 who is believed to be a supplier of kilogram-quantities of narcotics in the New York City area. As part of that investigation, law enforcement agents have been working with a cooperating witness ("CW-1").[1]

      b.     Between in or about August 2018, and in or about October 2018, on four separate occasions, CW-1, acting at law enforcement direction, purchased from CC-3 a total of more than 400 grams of substances that later tested positive for fentanyl and heroin. In each transaction, CW-1 or an undercover officer acting in concert with CW-1 gave CC-3 a sum of pre-recorded buy money, and in exchange, CC-3 provided the requested narcotics.

      c.     In or about May and June 2019, pursuant to a judicially-authorized wiretap on a cellphone used by one of CC-3's co-conspirators ("CC-4"), law enforcement intercepted the following communications, in substance and in part, between CC-

---

[1] CW-1 has pleaded guilty to federal racketeering and narcotics charges pursuant to a cooperation agreement with the Government, in the hope of receiving leniency at sentencing. CW-1's information has proven credible and reliable, and it has been corroborated by other evidence, including narcotics recovered during this investigation.

5

4, another co-conspirator("CC-5"), and CC-3 regarding an upcoming narcotics transaction:[2]

May 28, 2019

> CC-5: Leaving friday best I can do...still got 75 of that other definitely need that 100 to mix with...pockets hurt but I'll have that bread for you when I touch.
> CC-5: That other hit hurt hope that shit aint like that need that shit on point.
> CC-4: Like the last

        d.    Based on my training, experience, and my conversations with other law enforcement officers involved in the investigation of CC-3, I believe that CC-5 was asking CC-4 for 100 grams of fentanyl ("need that 100") to combine with ("mix with") narcotics previously purchased from CC-4 ("still got 75 of that other").

June 3, 2019

> CC-4: The faggot couldn't come this weekend bro
> CC-3: Listen to that now!
> CC-4: No, he wants that I meet with him…at least, half way.
> . . .
> CC-4: No, it's for today…it's today…I'm going to pick it up in a little while, you heard? I'm gonna go get that shit, right now, eh told me, he is ready for me…that he has it. It's going to take me a couple of hours but, I will go to you tonight. …
> CC-3: So, what you gonna need?
> CC-4: Uh…at least to make one peso . . .
> CC-4: But make sure it's like the last . . . good!

        e.    Based on my training, experience, and my conversations with other agents involved in the investigation of CC-3, I believe that CC-4 and CC-3 were discussing CC-3's supplying CC-4 with $1,000 worth of heroin ("at least to make one peso") that CC-4 was going to deliver to CC-5.

---

[2] All descriptions and quotations of intercepted communications are based on preliminary draft summaries, transcripts, and/or translations of recordings.

6

f.  Based on my conversations with agents involved in the investigation of CC-3, I have learned that, on or about June 3, 2019, following the communications discussed above, CC-4 drove to the residence (the "Residence")[3] of CC-3 in Brooklyn, New York, entered briefly, and then returned to his vehicle. CC-4 then drove to the Washington, D.C. area, where agents observed CC-4 meet with CC-5 in a parking lot and engage in what law enforcement agents believed, based on their training and experience, to be a narcotics transaction.  Agents subsequently arrested CC-5 and recovered approximately 100 grams of a substance that field-tested positive for heroin.

The Defendants Engage in a Narcotics Transaction with CC-3

7.  Based on my participation in this investigation and my conversations with other law enforcement agents and my review of reports, I am aware of the following, in substance and among other things:

a.  On or about August 21, 2019, law enforcement agents were conducting surveillance on the Residence of CC-3 when they observed LUIS PARRALES and GILBERTO LUCIANO VAZQUEZ, the defendants, arrive at the Residence in a Jeep Cherokee ("Vehicle-3").

b.  Agents observed LUIS PARRALES exit from the driver's-side front door of Vehicle-3, look around, and then enter the Residence.  Shortly thereafter, agents observed LUIS PARRALES exit the Residence carrying a black bag (the "Bag"). Agents then observed LUIS PARRALES secrete the Bag in the rear portion of Vehicle-3 under the spare tire.

c.  Agents then observed LUIS PARRALES enter the driver's-side seat of Vehicle-3, while VAZQUEZ remained in the passenger-side front seat.  Vehicle-3 then departed the Residence and was observed traveling at a high rate of speed, in violation of the posted speed limit.

d.  Agents conducted a traffic stop of Vehicle-3 based on the traffic infraction.  When agents approached Vehicle-3, agents detected a chemical odor that was, based on their training and experience, consistent with the smell of cocaine.  Agents told LUIS PARRALES, who was in the driver's

---

[3] Law enforcement identified the Residence as where CC-3 lives based on a review of commercial databases and law enforcement surveillance.

seat, that Vehicle-3 smelled like narcotics. In response, LUIS PARRALES stated, in sum and substance, that there were no narcotics inside of Vehicle-3. Agents asked for LUIS PARRALES's consent to search Vehicle-3, and LUIS PARRALES agreed.

   e. Agents then conducted a consent search of Vehicle-3 and handcuffed LUIS PARRALES and VAZQUEZ for officer safety. Agents recovered approximately $5,000 in cash from LUIS PARRALES's front pocket and approximately $25,000 in cash from inside the Bag, which was hidden in the rear portion of Vehicle-3. At that point, agents placed LUIS PARRALES and VAZQUEZ under arrest.

### The Search of the Residence

  8. Based on my participation in this investigation and my conversations with other law enforcement agents and my review of reports, I am aware of the following, in substance and among other things:

   a. On or about August 22, 2019, agents conducted a search of CC-3's Residence pursuant to a search warrant signed by the Honorable Steven L. Tiscione, United States Magistrate Judge for the Eastern District of New York (the "Premises Warrant").

   b. While conducting a search of the Residence pursuant to the Premises Warrant, agents found, among other things, a clear bag containing a white powdery substance that they believe, based on their training and experience, to be cocaine. Based on my conversations with other agents, I am aware that the bag containing the cocaine weighed approximately 952 grams, *i.e.*, slightly less than a kilogram. Based on my training and experience, I am aware that the approximate wholesale value of one kilogram of cocaine is $30,000, *i.e.*, the same amount of cash that was recovered from Vehicle-3 shortly after agents observed LUIS PARRALES, the defendant, exit the Residence and enter Vehicle-3 and drive away at a high rate of speed with GILBERTO LUCIANO VAZQUEZ, the defendant.

WHEREFORE, I respectfully request that LUIS PARRALES and GILBERTO LUCIANO VAZQUEZ, the defendants, be imprisoned or bailed as the case may be.

_____
CHRISTOPHER GULINO
Special Agent
Homeland Security Investigations


Sworn to before me this
22nd Day of August, 2019

_____
THE HONORABLE GABRIEL W. GORENSTEIN
CHIEF UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT A

Approved: _____
NICHOLAS W. CHIUCHIOLO
Assistant United States Attorney

Before: HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

**19MAG 7586**

--------------------------------- x
                                  :
UNITED STATES OF AMERICA          :   COMPLAINT
                                  :
         - v. -                   :   Violation of 21 U.S.C.
                                  :   § 846
GILBERTO LUCIANO VAZQUEZ, and     :
CARLOS PARRALES,                  :
                                  :   COUNTY OF OFFENSE:
                Defendants.       :   NEW YORK
                                  :
--------------------------------- x

STATE OF NEW YORK          ) ss:
SOUTHERN DISTRICT OF NEW YORK )

 CHRISTOPHER GULINO, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and charges as follows:

COUNT ONE
(Narcotics Conspiracy)

 1. On or about August 13, 2019, in the Southern District of New York and elsewhere, GILBERTO LUCIANO VAZQUEZ and CARLOS PARRALES, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

 2. It was a part and object of the conspiracy that GILBERTO LUCIANO VAZQUEZ and CARLOS PARRALES, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

 3. The controlled substance that GILBERTO LUCIANO VAZQUEZ and CARLOS PARRALES, the defendants, conspired to distribute and

1

possess with intent to distribute was five kilogram and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

4. I am a Special Agent with HSI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

5. Based on my participation in this investigation, including my review of reports and my conversations with other law enforcement officers, I am aware of the following, among other things:

a. Based on my participation in this investigation, including my conversations with other law enforcement agents and my conversations with other individuals with knowledge relevant to this investigation, I and other law enforcement agents involved in this investigation had knowledge that a narcotics transaction was likely to take place in the vicinity of Doremus Avenue and Delancy Street in Newark, New Jersey--a dirt lot with numerous eighteen-wheeler tractor trailers parked on it (the "Lot")--on or about August 13, 2019.

b. Based on that information, among other things, on or about August 13, 2019, law enforcement agents conducted physical surveillance in the vicinity of the Lot.

c. On or about August 13, 2019, at approximately 10:20 p.m., law enforcement agents observed a black Mercedes sedan ("Vehicl-1"), in the vicinity of the Lot, conducting what appeared to them, based on their training and experience, to be

counter surveillance. Specifically, agents observed Vehicle-1 driving at a slow rate of speed on the streets surrounding the Lot, which is an industrial area that, at that time, had little other vehicle traffic. While Vechile-1 was conducting counter surveillance, agents observed Vehicle-1 flash its headlights at one of the unmarked law enforcement vehicles.

        d.    After observing Vehicle-1 conduct counter surveillance for approximately twenty minutes, agents observed a black Toyota Camry ("Vehicle-2") exit the Lot. Both Vehicle-1 and Vehicle-2 departed the area at a high rate of speed.

        e.    Thereafter, agents conducted separate traffic stops of Vehicle-1 and Vehicle-2. Law enforcement agents searched Vehicle-2 pursuant to the automobile exception to the Fourth Amendment's warrant requirement. Inside of Vehicle-2's trunk, agents found multiple coolers, which, collectively, contained approximately forty-two packages of a white powdery substance that appeared to the agents, based on their training and experience, to be cocaine. Agents subsequently field tested one of these kilogram packages, which tested positive for the presence of cocaine. Based on my conversations with other law enforcement agents, I am aware that the narcotics seized from Vehicle-2 weighed approximately 46.3 kilograms. A photograph of the narcotics seized from Vehicle-2 is depicted below:



f. Thereafter, law enforcement agents arrested the driver of Vehicle-2, who was later identified as GILBERTO LUCIANO VAZQUEZ, the defendant. A Spanish-speaking agent advised VAZQUEz of his *Miranda* rights, in Spanish, and VAZQUEZ agreed to waive those rights.

g. VAZQUEZ told agents, in substance and in part, that two other individuals ("CC-1" and "CC-2") picked up VAZQUEZ in Brooklyn, New York, earlier that evening, and CC-1, CC-2, and VAZQUEZ traveled together to the Lot. VAZQUEZ further told agents, in substance and in part, that, while at the Lot, VAZQUEZ observed CC-1 and CC-2 obtain the narcotics from a barrel (the "Barrel") and load them into coolers inside Vehicle-2's trunk. VAZQUEZ stated, in substance and in part, that the narcotics did not belong to him but CC-1 and CC-2 were supposed to pay VAZQUEZ approximately $200 to transport Vehicle-2, which contained the narcotics, to New York.

h. VAZQUEZ further stated, in substance and in part, that he believed there were additional narcotics and a large quantity of cash located at the Lot. VAZQUEZ directed the agents to the Barrel from which CC-1 and CC-2 retrieved the narcotics. Inside the Barrel, agents observed numerous packages containing a white, powdery substance, which packages looked similar in appearance to the packages seized from inside Vehicle-2. Based on my conversations with other law enforcement officers who weighed these packages and field tested one of them, I am aware that the packages obtained from the Barrel weighed approximately 25.78 kilograms field tested positive for the presence of cocaine.

i. VAZQUEZ further stated, in substance and in part, that he knows CARLOS PARRALES, the defendant, that he observed PARRALES speaking with CC-1 and CC-2 at the Lot, and that he was surprised to see PARRALES at the Lot because he did not think PARRALES was involved.

j. At or around the same time agents stopped Vehicle-2, other law enforcement agents stopped Vehicle-1. Agents placed Vehicle-1's driver, who was later identified as PARRALES, under arrest.

k. While conducting a search incident to arrest, agents located four cellphones inside of Vehicle-2. PARRALES stated, in substance and in part, that one of the cellphones was his and he was unaware who owned the other cellphones.

4

WHEREFORE, I respectfully request that GILBERTO LUCIANO VAZQUEZ and CARLOS PARRALES, the defendants, be imprisoned or bailed as the case may be.

CHRISTOPHER GULINO
Special Agent
Homeland Security Investigations

Sworn to before me this
14th Day of August, 2019


THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK